# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LORETTA L. LETT, | ) | **Case No.  1:13CV2517** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | **Magistrate George J. Limbert** |
| **v.** | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT & RECOMMENDATION OF** |
| COMMISSIONER OF | ) | **MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Loretta L. Lett ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1.  Plaintiff challenges the Administrative Law Judge's ("ALJ") Step Three finding that her degenerative disc disease ("DDD") and back impairments did not meet or equal Listing 1.04A and she asserts that the ALJ erred in determining her residual functional capacity ("RFC"). ECF Dkt. #13. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND this case to the ALJ for further factfinding, analysis and articulation as to whether Plaintiff's back impairments, individually, or in combination with her other impairments, medically equal Listing 1.04A.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

1

I.    **PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on September 24, 2010[2] alleging disability beginning February 22, 2009 due to degenerative bone disease and arthritis.  ECF Dkt. #11.   Tr. at 227.   The Social Security Administration ("SSA") denied Plaintiff's application initially and upon reconsideration.  *Id.* at 107-115.  Plaintiff requested a hearing before an ALJ which was held on June 19, 2012.  *Id.* at 51, 116.

On July 19, 2012, the ALJ issued a decision finding that Plaintiff had the severe impairments of ("DDD"), degenerative joint disease ("DJD") status post left knee surgeries in 2001, 2011 and 2012, and moderate obesity.  Tr. at 14.   The ALJ further found that none of Plaintiff's severe impairments, either individually or in combination, met or equaled a listed impairment in 20 C.F.R. Part 4, Subpart P, Appendix 1.  *Id.* at 15.  He found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except that she required a sit/stand option.  *Id.*  Based upon this RFC, the ALJ  found that Plaintiff could not return to her past relevant work, but, relying upon the testimony of the vocational expert ("VE"), she could perform other jobs existing in significant numbers in the national economy, such as the representative occupations of a general office clerk, receptionist and auditing clerk.  *Id.* at 24-25.

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council, but the Appeals Council denied her request for review.  Tr. at 1-6. The ALJ's decision therefore became the final decision of the Commissioner.

---

[2] The record shows that Plaintiff also applied for Disability Insurance Benefits on the same date, but no one raises issues concerning this application.  ECF Dkt. #11 at 201.

Plaintiff appealed that decision to this Court on November 13, 2013.  ECF Dkt. #1.  Judge Gaughan referred the instant case to the undersigned on the same date.  Plaintiff filed her brief on the merits on April 14, 2014, Defendant filed her brief on the merits on May 14, 2014 and Plaintiff filed a reply brief on May 22, 2014.  ECF Dkt. #s 13, 15, 16.

## II.  SUMMARY OF RELEVANT MEDICAL EVIDENCE

Records show that Plaintiff underwent a diagnostic medical branch block at L4-L5 and L5-S1 on September 29, 2006 for a diagnosis of spondylosis without myelopathy.  Tr. at 560.

On May 11, 2007, Plaintiff presented to the emergency room complaining of acute lower back pain that occurred when she lifted something the day prior.  Tr. at 544.  Straight leg raising was negative and she had painless range of motion.  *Id.* at 545.  An x-ray of the lumbosacral spine showed spurring at the anterior superior aspct of L3 and minimal spurring at L4.  *Id.* at 546.  She was diagnosed with mild to moderate degenerative changes relative to her age, most severe at L2-L3, and she was given a Toradol injection.  *Id.*

On May 23, 2007, Dr. Namey, D.O., Plaintiff's primary care physician, ordered a MRI of Plaintiff's lumbar spine for her complaints of low back pain extending down both legs.  Tr. at 362.  The results showed that Plaintiff had mild right paramedian disc herniation at L5-S1 causing slight right-sided anterior thecal sac flattening.  *Id.*

In January of 2008, Plaintiff reported to Dr. Namey that her low back pain was persisting and she was having trouble ambulating.  Tr. at 297.  Dr. Namey found that Plaintiff had tenderness over her lumbar spine, a positive straight leg raise and tenderness over the bilateral S1 joint and L3-L4, L4-L5 and L5-S1 region.  *Id.*  He assessed lumbar disc disease and lumbar DJD.  *Id.*  He prescribed Lortab, Motrin 600 mg, and a Lidoderm patch.  *Id.*  Dr. Namey saw Plaintiff on February 18, 2008 for her complaints of low back pain and difficulty ambulating.  *Id.* at 297.  Upon examination, he noted

-3-

tenderness at L4-L5 and L5-S1, positive straight leg raises, L5 decreased range of motion, and L5 weakness on the left.  *Id*.  He assessed lumbar disc disease and prescribed Lortab.  *Id*.

On March 18, 2008, Plaintiff followed up with Dr. Namey for her back pain after she reported falling a few days prior.  Tr. at 297.  Dr. Namey noted spasm and tenderness of Plaintiff's paradorsal spine and positive straight leg raises.  *Id*.  He assessed lumbar strain and prescribed Lortab, Flexeril and Ibuprofen 600 mg.  *Id*. In April of 2008, Plaintiff presented to Dr. Namey twice for her low back pain.  *Id*. at 296.  On April 14, 2008, Plaintiff reported that she was working a lot of hours.  *Id*. Examination revealed positive straight leg raises, spasm and tenderness over the lumbar spine and an obvious limp.  *Id*.  Dr. Namey diagnosed lumbar strain and lumbar disc disease and prescribed Lortab and Flexeril.  *Id*.  April 17, 2008 notes show that Plaintiff reported low back pain and excessive fatigue.  *Id*. She reported that she slept only five hours per night and had periods where she would rest for an hour and then she would wake up for two hours.  *Id*.  Dr. Namey assessed fatigue, ruled out hypothyroidism and polyarthritis.  *Id*.  He ordered a rheumatoid workup.  *Id*.  He ordered blood tests to check for autoimmune diseases and Lyme disease and the results were negative.  *Id*. at 311-314.

On June 13, 2008, Plaintiff presented to Dr. Namey for severe low back pain, reporting that her work hours had increased and she was having occasional paresthesias of the legs.  Tr. at 296.  Dr. Namey's examination revealed spasm and tenderness to the dorsal lumbar spine region and positive straight leg raises.  *Id*.  He diagnosed lumbar disc disease and prescribed Flexeril, Lortab and Ibuprofen 600 mg.  *Id*. On July 14, 2008, Plaintiff followed up with Dr. Namey for her back pain and reported difficulty ambulating at times.  *Id*. at 298.  He found tenderness in her paralumbar spine region upon examination and positive straight leg raises.  *Id*.  He prescribed Motrin 600 mg and Norco.  *Id*.

-4-

Dr. Namey examined Plaintiff on August 11, 2008 and noted back spasms and tenderness in the lower lumbar region.  Tr. at 298.  He assessed lumbar strain and lumbar DJD and renewed her Lortab, Flexeril and Ibuprofen 600 mg.  *Id.*  On September 19, 2008, Plaintiff followed up with Dr. Namey for her low back pain and indicated that she went to see a pain management specialist.  *Id.* at 298.  She reported that he suggested an epidural nerve block but she declined, stating that she did not want the nerve block and she did not want to miss work.  *Id.*  Dr. Namey noted upon examination that Plaintiff had positive straight leg raises, and spasms and tenderness along the paralumbar spine.  *Id.* He assessed lumbar disc disease, renewed the prescriptions for Lortab and Motrin 600 mg, and advised Plaintiff to minimize lifting at work and to decrease her work hours.  *Id.*

October 30, 2008 notes from Dr. Namey indicate that Plaintiff presented for follow up and reported low back pain with pain radiating down her bilateral buttocks.  Tr. at 298.  He noted that she had an obvious limp and had positive straight leg raises.  *Id.*  He diagnosed lumbar strain and refilled her Lortab.  *Id.*  On November 25, 2008, Plaintiff presented to Dr. Namey complaining of low back pain and discomfort.  *Id.* at 295.  She reported that she has good days and bad days.  *Id.*  Dr. Namey examined Plaintiff and noted spasm and tenderness of the paralumbar spine and positive straight leg raises, with L4-L5 tenderness as well.  *Id.*  He assessed lumbar disc disease and prescribed Flexeril, Ibuprofen 600 mg and Lortab.  *Id.*

Plaintiff presented to Dr. Namey on December 23, 2008 for her complaints of low back pain with radiation of pain to her bilateral buttock region.  Tr. at 295.  She requested a Lidoderm patch. *Id.*  upon examination, Dr. Namey noted paralumbar spine tenderness, positive straight leg raises and that Plaintiff was limping.  *Id.*  He assessed lumbar DJD and lumbar disc disease and prescribed a Lidoderm patch, Flexeril, Ibuprofen 600 mg and Lortab.  *Id.*

-5-

January 2, 2009 blood test results ordered by Dr. Namey for Plaintiff to check to see if she had autoimmune diseases or Lyme Disease were again negative.  Tr. at 301, 302, 304.  On January 9, 2009, Plaintiff presented to Dr. Namey for reevaluation of her bronchitis and her lumbar disc disease. *Id*. at 295.  Plaintiff reported that she was still having severe low back pain.  *Id*.  Upon examination, Dr. Namey noted spasm and tenderness to the paralumbar spine.  *Id*.  He assessed lumbar disc disease and refilled Plaintiff's Lortab and Ibuprofen 600 mg.  *Id*.  In February of 2009, Plaintiff presented twice to Dr. Namey for her low back pain. *Id*. at 294.  On February 5, 2009, Plaintiff reported that she had a new job and she was on her feet about eight hours per day, which caused pain shooting down her legs.  *Id*.  Dr. Namey noted spasm and tenderness in the paralumbar spine in L4-L5 and L5-S1 with decreased range of motion.  *Id*.  He assessed lumbar spine DJD and lumbar disc disease.  *Id*.  He prescribed Lortab and Ibuprofen 600 mg, but advised Plaintiff to take only the Ibuprofen during the workday.  *Id*.

On March 26, 2009, Plaintiff presented to Dr. Namey complaining of pain down both of her legs and difficulty ambulating.  Tr. at 294.  Upon examination, Dr. Namey found positive straight leg raises, decreased range of motion and spasms and tenderness in her paralumbar spine.  *Id*.  He assessed lumbar strain and renewed her Ibuprofen 600 mg, Flexeril and Lortab.  *Id*.  Plaintiff presented to Dr. Namey on April 27, 2009 with low back pain and Dr. Namey found spasm and tenderness along the paralumbar spine and positive straight leg raises.  *Id*. at 294.  He assessed lumbar strain and renewed her Lortab and Flexeril.  *Id*.

On May 14, 2009, Dr. Namey examined Plaintiff for her low back pain and difficulty ambulating, with pain radiating into her left hip.  Tr. at 293.  He noted palpatory tenderness to her

lumbar spine and positive straight leg raising.  *Id*.  He diagnosed lumbar disc disease and lumbar DJD and prescribed Flexeril and Ibuprofen 600 mg.  *Id*. Plaintiff presented to Dr. Namey twice in June of 2009 for her low back pain.  *Id.* at 293.  At her June 25, 2009 visit, Plaintiff reported having difficulty ambulating and stated that at times her feet go numb, but she had increased her activity as she was playing co-ed softball and working doing extra lifting.  *Id*.  Dr. Namey noted that he had advised Plaintiff against lifting more than fifteen pounds.  *Id*.  Dr. Namey found spasm and tenderness to Plaintiff's paralumbar spine upon examination, L4-L5 and L5S1 tenderness, and positive straight leg raises bilaterally.  *Id*.  He diagnosed lumbar disc disease  and prescribed Lortab.  *Id*.

On July 21, 2009, Plaintiff presented to Dr. Namey for low  back  pain  and  he  noted  that Plaintiff was walking with an obvious limp, had spasms and tenderness in the paralumbar spine and difficulty with flexion and extension.  Tr. at 293.  He diagnosed her with lumbar DJD and prescribed Flexeril, Ibuprofen 600 mg and Lortab.  *Id*.

On September 11, 2009, Plaintiff presented to Dr. Namey requesting refills of medications for her low back pain and difficulty ambulating.  Tr. at 292.  He noted paralumbar spine pain upon examination, as well as positive straight leg raise and observation that Plaintiff was walking with a limp.  *Id*.  He diagnosed lumbar disc disease and prescribed Flexeril, Motrin 800 mg and Lortab.  *Id*.

On October 1, 2009, Dr. Namey examined Plaintiff for her low back pain and discomfort with pain radiating down to her bilateral buttocks.  Tr. at 292.  He noted tenderness and diagnosed chornic lumbar strain and lumbar disc disease.  *Id*.  He prescribed Motrin 800 mg, Lortab and Flexeril.  *Id*. On October 30, 2009, Plaintiff presented to Dr. Namey for back pain and he noted spasm and tenderness upon examination, as well as positive straight leg raising.  *Id*. at 292.  He diagnosed lumbar DJD and continued her medications.  *Id*.

On November 30, 2009, Plaintiff presented to Dr. Namey complaining of low back pain and discomfort with difficulty ambulating.  Tr. at 291.  Upon examination, Dr. Namey noted that Plaintiff had tenderness in her paralumbar spine region with decreased range of motion.  *Id*.  He diagnosed lumbar disc disease and prescribed Lortab and Motrin 800 mg.  *Id*.  On December 29, 2009, Plaintiff presented to Dr. Namey with complaints of low back pain and discomfort.  *Id*. at 291.  He noted spasm and tenderness upon examination and diagnosed lumbar disc disease.  *Id*.  He refilled Plaintiff's Lortab and Motrin 800 mg.  *Id*.

On March 25, 2010, Dr. Namey examined Plaintiff for low back pain and discomfort with cough and congestion.  Tr. at 291. Dr. Namey noted tenderness along her paralumbar spine, a positive straight leg test and rhonchi.  *Id*.  He diagnosed Plaintiff with bronchitis,  lumbar DJD and lumbar disc disease.  *Id.* He prescribed a Z-pak, Motrin 800 mg, Lortab, and Flexeril.  *Id*.

On April 11, 2010, Plaintiff presented to the emergency room reporting that she fell from a chair onto her back the day prior.  Tr. at 276.  The attending doctor noted that upon examination, Plaintiff had a decreased range of motion, tenderness in her back, negative straight leg raising, full range of motion in her upper and lower extremities, and a normal neurologic examination.  *Id*. at 277. He diagnosed Plaintiff with acute lumbosacral strain and contusion in the right lumbar region, gave her a Toradol injection, and prescribed Flexeril and Naproxen.  *Id*. at 277-278.

On May 14, 2010, Plaintiff presented to the emergency room complaining of left forearm pain as of the day prior when she dropped a heavy object.  Tr. at 280.  She was diagnosed with a left forearm contusion, was given an arm sling, and Motrin 800 mg.  *Id.* at 282.

On May 25, 2010, Dr. Namey examined Plaintiff for her complaints of severe low back pain and discomfort.  Tr. at 360.  He noted that Plaintiff had palpatory tenderness and positive straight leg

raises.  *Id.*  He assessed lumbar DJD and prescribed Lortab.  *Id.*

On June 24, 2010, Dr. Namey examined Plaintiff for her complaints of low back pain and discomfort.  Tr. at 360.  He noted that Plaintiff had positive straight leg raises.  *Id.*  He assessed lumbar DJD and prescribed Lortab, and Ibuprofen 800 mg.  *Id.*

On July 16, 2010, Plaintiff presented to Dr. Namey complaining of low back pain and discomfort with pain radiating down her bilateral leg region.  Tr. at 291.  Upon examination, Dr. Namey noted tenderness of Plaintiff's L4-L5 and right and leg SI joint.  *Id.*  He diagnosed DJD of the right SI joint and lumbar disc disease and prescribed Ibuprofen 800 mg and Lortab, and gave her an injection into her right SI joint.  *Id.*

On August 16, 2010, Dr. Namey examined Plaintiff for her complaints of low back pain and discomfort.  Tr. at 360.  He noted that Plaintiff had an obvious limp and had spasm and tenderness in the lumbar spine and positive straight leg raises.  *Id.*  He assessed lumbar disc disease and prescribed Lortab.  *Id.*

On September 3, 2010, Plaintiff saw Dr. Namey for her low back pain.  Tr. at 290, 359.  She requested an injection and reported that she ached all over and had headaches.  *Id.*  Dr. Namey noted that Plaintiff had severe bilateral SI joint pain and tenderness at the L4-L5, L5-S1 and left SI joint. *Id.*  He assessed DJD in the right and left SI joints and a herniated lumbar disc.  *Id.*  He performed an arthocentesis (draining of fluid from a joint) and prescribed a Medrol dosepak.  *Id.*

On September 10, 2010, Plaintiff presented to Dr. Namey complaining of severe low back pain and hand pain.  Tr. at 288.  He noted that Plaintiff's rheumatologic workup was negative and he diagnosed polyarthritis and DJD in the lumbar region and hands.  *Id.*  He renewed Plaintiff's Hydrocodone and prescribed Flexeril and Motrin 600 mg.  *Id.*

On September 20, 2010, Dr. Namey examined Plaintiff for her low back pain.  Tr. at 289, 358. He noted that Plaintiff's pain was located in the left sacroiliac joint and radiated to the left hip and down the left leg region.  *Id.*  Plaintiff reported that she had difficulty ambulating and getting out of bed.  *Id.*  Upon examination, Dr. Namey noted that Plaintiff had positive straight leg raises bilaterally, tenderness to the left SI joint, decreased deep tendon reflexes and restricted range of motion.  *Id.*  He diagnosed lumbar disc disease and refilled Plaintiff's Lortab prescription.  *Id.*  He also referred Plaintiff for physical therapy evaluation and treatment.  *Id.*

On September 25, 2010, Plaintiff presented to the emergency room with complaints of back pain after reporting that she twisted her back after tripping over her dog.  Tr. at 450.  Upon examination, the attending physician noted decreased range of motion and muscle spasms.  *Id.* She was diagnosed with acute exacerbation of chronic back pain and given medications.  *Id.* at 451.

On October 11, 2010, Plaintiff presented to Dr. Namey complaining of severe low back pain and difficulty ambulating.  Tr. at 288.  She stated that the medications were no longer helping her. *Id.* Upon examination, Dr. Namey noted that Plaintiff had tenderness in her lumbar spine at L4-L5. *Id.*  He diagnosed lumbar disc disease and prescribed Lortab and Flexeril and required Plaintiff to return in 10 days.  *Id.*  Plaintiff returned to Dr. Namey on October 19, 2010 and her medications were refilled.           On November 16, 2010, Dr. Namey examined Plaintiff for her complaints of severe low back pain and her request for a back injection.  Tr. at 357.  He noted that Plaintiff walked with a limp and had spasm and tenderness to the paralumbar spine with positive straight leg raises.  *Id.*  He assessed lumbar DJD and prescribed Flexeril and Lortab.  *Id.*

On December 16, 2010, Plaintiff presented to Dr. Namey for neck pain and low back pain.  Tr. at 356.  He noted tenderness to Plaintiff's paralumbar spine and her history of lumbar disc disease.

*Id.*  He prescribed Lortab and Motrin 800 mg.  *Id.*

On January 14, 2011, Dr. Namey examined Plaintiff for her complaints of severe low back pain with radiation to her bilateral buttocks and difficulty bending at times  and leg weakness.  Tr. at 356. He noted that Plaintiff had spasm and tenderness in the paralumbar spine with positive straight leg raises and L5 motor weakness.  *Id*.  He assessed lumbar disc disease and prescribed Lortab and Flexeril.  *Id*.

On February 7, 2011, Dr. Namey examined Plaintiff for her complaints of severe low back pain and discomfort.  Tr. at 355.  He noted that Plaintiff had pain to the L4-L5 and L5-S1 regions with positive straight leg raises.  *Id*.  He assessed lumbar DJD and disc disease.  *Id*.  He injected Plaintiff's SI joint and prescribed Motrin 600 mg and Hydrocodone.  *Id*.

On February 10, 2011, Dr. Massullo performed an examination of Plaintiff for the agency.  Tr. at 315.  She noted that Plaintiff's main complaint was that she could not sit or stand for long periods of time and she could not keep a job because there was either too much lifting, too much repetitive movement, or too much time that needed to be spent on her feet.  *Id*.  Plaintiff reported that her joints hurt all of the time and she could barely complete normal daily living activities.  *Id.*  Upon examination, Dr. Massullo reported that Plaintiff's gait was normal, Plaintiff reported no need for an ambulatory aid, and Plaintiff was able to grasp and manipulate with her hands, and no heat, redness, swelling or thickening was noted on her hands.  *Id.* at 316.  Dr. Massullo noted that Plaintiff had restriction of motion of her dorsolumbar spine upon full flexion and bilateral hips in full flexion.  *Id*. She also noted that Plaintiff's tandem gait was unsteady and Plaintiff indicated that she did not want Dr. Massullo to touch her back as when Dr. Massullo barely touched her back, she winced.  *Id*.

Dr. Massullo related that when Plaintiff performed range of motion of the dorsolumbar spine,

she reported that she could not go further than 30 degrees, which was different than what Dr. Massullo observed throughout the rest of the exam when Plaintiff was moving about.  Tr. at 316.  Dr. Massullo ordered x-rays of Plaintiff's lumbar spine which showed no focal abnormality.  *Id*. at 324.  Among other diagnoses, Dr. Massullo diagnosed Plaintiff with moderate exogenous obesity, tobacco abuse noncompliance with treatment, hypertension, telangiectatic areas over the body, diminished ranges of motion in the dorsolumbar spine in full flexion and in the bilateral hips in full flexion, unsteady tandem gait, slightly unreliable range of motion testing as she observed Plaintiff doing more than Plaintiff said that she could do, and generalized arthalgia.  *Id.* at 317.  Dr. Massullo concluded that jobs requiring prolonged walking, standing, traveling, using lower extremities, bending, and lifting using her lower back would be slightly compromised due to Plaintiff's discomfort at even the slightest touch and diminished range of motion of the dorsolumbar spine in full flexion and hips in bilateral flexion.  She further opined that working from a seated position using bilateral upper extremities was not compromised by Plaintiff's impairments*.  Id.*

On February 18, 2011, Dr. Halas performed a state agency psychological evaluation of Plaintiff.  Tr. at 324.  Plaintiff reported to Dr. Halas that she was married and had two children.  *Id.* She indicated that she dropped out of school after failing the ninth grade and being too embarrassed to go back and repeat the grade.  *Id.*  She reported that she tried to obtain her GED, but was unsuccessful in passing the pre-test and was embarrassed by her inability to read and write.  *Id.*

Plaintiff explained that she last worked in 2010 for Wec Industries through Kelly Services, but worked only two months as she had to leave due to back problems.  Tr. at 325.  She also worked for various factories for six months and had worked as a cashier, which ended due to knee surgery.  *Id.*

-12-

On mental status examination, Dr. Halas noted that Plaintiff was oriented, with slow, hesitant and constricted speech.  Tr. at 325.  He noted that her most unusual behavior was a flat, hesitant and tentative presentation and her tendency to minimize and/or deny problems.  *Id*.  He found that she had good eye contact and showed relatively high levels of anxiety by fidgeting and she seemed tense, anxious and apprehensive, but not specifically phobic.  *Id*.  at 326.  Plaintiff reported problems sleeping at night and noted crying spells and was tearful at times during the interview.  *Id*.  Dr. Halas noted that Plaintiff's psychomotor activity reflected retardation, and her energy level was described as poor and below average.  *Id*.  Plaintiff admitted feelings of hopelessness, helplessness, worthlessness, and guilt. *Id*.  Dr. Halas found that Plaintiff's reality contact was adequate and she had no problems with hallucinations, delusions, or paranoid ideations.  *Id*.  He found her quality of consciousness good, as well as her levels of insight and judgment. *Id*.

Dr. Halas diagnosed Plaintiff with major depression, recurrent type and generalized anxiety disorder with occasional panic attacks.  Tr. at 327. He assessed a Global Assessment of Functioning rating of 45, which indicated serious limitations.  *Id*.  He opined that Plaintiff had: no impairment in following through with simple instructions and/or directions;  mild impairment in her mental ability to maintain attention and concentration to perform simple, repetitive tasks;  marked impairment in the ability to relate to others, including fellow workers and supervisors; and moderate restriction in the ability to withstand the stresses and pressures associated with day-to-day work activities as depression and anxiety symptoms would quickly exacerbate under the pressures of a normal work setting.  *Id.* at 327-328.

On February 22, 2011, Dr. Namey examined Plaintiff for her complaints of severe low back pain and discomfort.  Tr. at 355.  He found spasms and tenderness along Plaintiff's paralumbar spine and assessed anxiety and lumbar disc disease.  *Id*.  He prescribed Trazadone and Lortab.  *Id*.

On February 23, 2011, State agency medical consultant Dr. McCloud reviewed Plaintiff's file and found that she had medically determinable impairments of other and unspecified arthropathies and obesity, but they did not meet or equal any of the Listings.  Tr. at 84-85.  He opined that Plaintiff could lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently, she could sit, stand and/or walk up to six hours of an eight-hour workday, she could climb ramps and stairs but could never climb ladders, ropes or scaffolds, she could balance and kneel, but could only occasionally stoop and crouch.  *Id*. at 86-87.

On March 4, 2011, state agency medical consultant, Dr. Voyten, Ph.D., reviewed Plaintiff's file and determined that Plaintiff's affective disorders under Listing 12.04 and anxiety-related disorders under Listing 12.06 caused mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Tr. at 85-89.  In the narrative assessment, Dr. Voyten opined that Plaintiff could complete repetitive tasks in environments without time or production pressure.  *Id.* at 88.  She further noted that while Dr. Halas had opined a marked limitation in social interaction due to depression and anxiety and panic attacks, weight should not be given to this opinion because Plaintiff had no history of mental health treatment and had not taken medications for these conditions.  *Id.*  Dr. Voyten opined that Plaintiff  was capable of "superficial social interactions."  *Id*. at 89.  Dr. Terry, Ph.D. affirmed Dr. Voyten's findings but added a restriction of moderate limitation to carry out very short and simple instructions.  *Id*. at 99.

On March 8, 2011, Dr. Namey examined Plaintiff for her complaints of severe low back pain and discomfort and her report that her legs went numb one night while she was in bed.  Tr. at 355.  He noted that Plaintiff had  paralumbar spine tenderness and positive straight leg raises.  *Id*.  He assessed lumbar disc disease and prescribed Lortab and Trazadone.  *Id*.  He also referred her to Dr. Pagano for her severe lumbar disc disease.  *Id.*

On March 15, 2011, Plaintiff presented to the emergency room due to her back pain. Tr. at 333. A lumbosacral spine x-ray was ordered and showed endplate osteophytes at L3-L4. *Id*. at 442. The attending physician indicated that Plaintiff had DJD of the L3-L4 with spurring. *Id*. at 334, 442. He diagnosed her with acute lumbosacral strain/sprain. *Id*. Plaintiff underwent a back injection on March 22, 2011 after reporting to Dr. Namey that she had fallen on March 15, 2011 and the emergency room took x-rays which showed that she had a bruised tailbone. *Id*. at 350.

On March 29, 2011, Plaintiff was examined by Dr. Itani at the request of Dr. Namey for her chronic low back pain. Tr. at 330. He noted that Plaintiff's low back was tender to the touch, with no atrophy upon motor examination, no gross motor deficits and straight leg raising at 60 degrees bilaterally. *Id.* He ordered lumbar spine x-rays and a MRI of the lumbar spine. *Id*.

In April 19, 2011, Dr. Namey gave Plaintiff an injection in her back and refilled her medications for her complaints of back pain, stiffness and loss of muscle strength. Tr. at 346.

May 26, 2011 notes from Dr. Namey show that Plaintiff reported back pain and requested an injection and refills of her medications. Tr. at 336. Dr. Namey examined Plaintiff and noted that Plaintiff's joints were warm to the touch and she had decreased lumbar range of motion. *Id*. at 339. He found positive straight leg raising on both sides and right sciatic notch tenderness. *Id*. at 347. He diagnosed herniated lumbar disc and DJD of the lumbar spine and added Trazodone to Plaintiff's medications. *Id.* at 340, 347-348.

On June 7, 2011, Dr. Hill evaluated Plaintiff at the request of Dr. Namey. Tr. at 368. He noted Plaintiff's main complaint of low back pain with radiation down both legs to her ankles. *Id.* She also reported that she had fibromyalgia for the last 8 years. *Id.* Dr. Hill noted upon examination that Plaintiff had a wide-based gait but full strength in her bilateral upper and lower extremities, increased pain with extension and rotation of the lumbar spine and diffuse paraspinous muscle tenderness. *Id*. He concluded that Plaintiff had lumbar DDD with spondylosis by history. *Id*. He recommended that

Plaintiff undergo a series of lumbar facet blocks, medial branch nerve blocks at the L3-L4, L4-L5, and L5-S1 levels.  *Id.*  He also prescribed Meloxicam and Baclofen.  *Id.*

On June 13, 2011, Plaintiff presented to Dr. Namey refilled Plaintiff's medications and noted her complaints of back, feet and left leg pain.  Tr. at 618.  She described her pain as a constant ache that rated 7 out of 10 on a 10-point scale.  *Id.* at 621.  He refilled her medications.  *Id.* at 618.

On June 21, 2011, agency reviewing physician Dr. Torello examined Plaintiff's file and determined that her impairments of other and unspecified arthropathies did not meet or equal Listing 1.02.  Tr. at 98-100.  She determined that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, sit, stand and/or walk up to six hours per eight-hour workday, and could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds, she could occasionally balance, stoop, kneel, crouch and crawl.  *Id.* at 101.

On July 28, 2011, Plaintiff presented to the emergency room complaining of left ankle pain and swelling.  Tr. at 439.  X-rays showed soft tissue swelling and an ultrasound was normal.  *Id.* at 437-440.  She was diagnosed with post-surgical pain and prescribed compression hose.  *Id.* at 437.

On September 23, 2011, Plaintiff presented to Dr. Namey for an injection for her back pain and described the pain as sharp and rated the pain as a 6 on a 10-point scale.  *Id.* at 611.

On November 21, 2011, Plaintiff presented to Dr. Namey for medication refills and an injection for her back pain and she asked that her lidodaine patch be changed due to skin irritation.  *Id.* at 605.

On March 1, 2012, Plaintiff complained of dull, aching back pain that rated a 7 out of 10 on a pain scale.  *Id.*  Her medications were refilled and she was given an injection in her back.  *Id.* at 600.  Dr. Namey examined Plaintiff and noted that Plaintiff's joints were warm to the touch and she had decreased lumbar range of motion.  *Id.* at 602.

On April 10, 2012, Dr. Namey completed a medical source statement concerning Plaintiff's RFC for the time period February 22, 2009 through the date of the statement.  Tr. at 630.  He opined that because of her herniated lumbar disc, back pain, stiffness and degenerative lumbar spine, Plaintiff could stand and walk for less than 15 minutes at a time before she would have to sit down for 30 minutes and she could stand for a total of 2 hours during an eight-hour workday.  *Id.*  Dr. Namey further opined that due to her back pain, weakness and stiffness, Plaintiff could sit for up to 15 minutes at one time before having to lie down for 30 minutes and could sit for about 3 hours total during an eight-hour workday.  *Id.* at 630-631.  He also opined that Plaintiff would need to lie down for 5 hours during an eight-hour workday in order to relieve pain from her impairments.  *Id.* at 631.  In a summary, Dr. Namey concluded that Plaintiff could stand/walk for a total of 2.15 hours during an eight-hour workday; sit for a total of 3.15 hours total during an eight-hour workday; and rest for a total of 5 hours total during an eight-hour workday.  *Id.*

Dr. Namey further opined that Plaintiff could rarely/never lift any amount of weight, and could rarely or never balance, or stoop.  Tr. at 632.  He anticipated that Plaintiff  would be absent from work more than three times a month.  *Id.*  He set forth his diagnoses for Plaintiff as herniated lumbar disc and lumbar DJD.  *Id.*

Dr. Namey also completed a pain questionnaire for Plaintiff on the same date.  Tr. at 633.  She listed Plaintiff's impairments of herniated lumbar disc and lumbar spine DJD as the impairments that were capable of producing pain and he summarized Plaintiff's subjective complaints as joint pain, back pain, stiffness and muscle aches.  *Id.*  He further opined that Plaintiff's complaints were reasonably derived from underlying impairments that were established by objective and clinical findings of a decreased range of motion and joint warmth.  *Id.*  He affirmed that the intensity and persistence of the pain as experienced by Plaintiff affected her ability to perform basic work-related activities because it limited the amount of time that she could sit, stand, and lift and caused her

increased fatigue and weakness, and also caused difficulty in concentration.  *Id*.  He opined that Plaintiff's pain was severe enough to constantly interfere with her attention and concentration.  *Id*.

On May 19, 2012, Plaintiff presented to the emergency room complaining of constant back pain.  Tr. at 671.  Her gait was slow and steady and she was diagnosed with exacerbation of chronic back pain.  *Id.* at 673, 675.

Plaintiff also has a history of left knee pain and surgeries associated with that pain.  Tr. at 386-399, 454-456, 562-597, 640-652.  A July 25, 2011 MRI of the left knee showed no evidence of internal derangement of the left knee and a small amount joint fluid.  *Id*. at 399. On December 7, 2001, Plaintiff presented to Dr. Seeds, an orthopedic surgeon complaining of increased pain in her left knee over the last eighteen months with the knee giving out and locking up on her.  *Id*. at 395.  On December 7, 2001, Plaintiff underwent arthroscopy of the left knee with debridement of medial condylar flap and visualization of patellofemoral instability.  *Id.* at 392. Her post-operative diagnosis was medial condylar flap and patellofemoral instability.  *Id*.

On July 16, 2009, Plaintiff presented to the emergency room complaining that she was "rehabbing a house" and injured her left knee.  Tr. at 454, 456.  X-rays showed minimal soft tissue swelling and the attending physician diagnosed left knee strain and gave her a knee immobilizer and medications.  *Id.* at 455-456.

In June of 2011, Plaintiff presented to Dr. Seeds complaining of left knee pain.  Tr. at 590, 594.  An x-ray showed lateral tilt of the patellofemoral joint and a MRI of the left knee showed an articular injury of the patella knee pain.  Tr. at 587.   On July 14, 2011, Plaintiff underwent an arthroscopy of the left knee with synovectomy of the lateral and patellofemoral compartment with chondroplasty of the medial facet patella and lateral tibial plateau.  *Id*. at 584.  Plaintiff continued to complain of knee having pain following the surgery and they discussed the need for injections. *Id*. at 561-578, 648-652.  On February 29, 2012, Dr. Seeds reported that a repeat MRI of the left

knee confirmed further articular injury. *Id*. at 576. After receiving injections with no relief,

Plaintiff underwent another arthroscopic surgery on April 19, 2012 with chondroplasty, meniscus

debridement and with synovectomy in two or more compartments. *Id.* at 641. She was thereafter

prescribed physical therapy. *Id.* at 640.

### III.     SUMMARY OF TESTIMONY

On June 19, 2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a

VE testified. Tr. at 51. Plaintiff and her counsel agreed at the hearing to amend her disability

onset date to September 20, 2012. *Id.* at 55. Plaintiff explained that the primary impairment that

keeps her from working is her back pain. *Id.* She explained that the lower back pain is constant

and radiates into her hips, knees and legs and causes numbness and tingling as well. *Id*. at 56. She

related that she attempted to work in 2010 but was unable to do so because at one of the jobs, she

could not stand as long as required and even if she were able to perform a sitting job, she probably

could not because she cannot sit for very long. *Id*. at 57.

Plaintiff opined that she could stand for ten minutes at a time, but not completely still, and

she would then need to sit down to rest from twenty minutes to one hour. Tr. at 57. She explained

that she also has trouble sitting and she could not sit without leaning because she could not sit

straight. *Id*. at 58. She stated that she has a computer but cannot use it because of the sitting

required to do so. *Id.* She also reported that she cannot lift over five pounds. *Id.* at 59. She

explained that surgery was recommended but her insurance would not cover a MRI so the surgery

could not be completed. *Id*. at 59. She also described her knee surgeries and continuing pain. *Id.*

Plaintiff described her typical day as going to bed at 1:30 a.m. and waking up at 4:30 a.m.

due to sleep problems, making coffee, trying to clean parts of the house if her children are not

home. Tr. at 60. She stated that she could fold the laundry if someone gets it out of the washer or

dryer, she can feed her dog and cat, and she can vacuum the floors but cannot finish them. *Id*. at

61.  She cannot lift bags of food, clean toilets, or wash dishes.  *Id*. at 62.  Her husband drove her to the hearing as while she has a driver's license, she does not drive much because she cannot sit for long periods of time.  *Id*.  She told the ALJ that the hour and a half drive to the hearing was painful and they had to stop once so she could get out and stretch.  *Id*.

When asked by her attorney about her lack of earnings between 2000 until 2008, Plaintiff explained that it was more her knee problems that made her unable to finish job requirements, so she just figured that she would stay home with her children.  Tr. at 63.  She related that she had always had back problems and tried to ignore them until they began getting worse over the years.  *Id*.  She reported that her back problems were more serious than her knee impairment.  *Id*.  at 72.

The VE then testified.  She reviewed Plaintiff's past relevant work.  Tr. at 73.  The ALJ then presented a hypothetical person with Plaintiff's age, education and work background who could perform sedentary work with a sit/stand option.  *Id*. at 74.  The VE testified that such a person could not perform Plaintiff's past relevant work, but she could perform a significant number of jobs existing in the national economy, including the occupations of general office clerk, a receptionist/information clerk, and an auditing clerk.  *Id.* at 74-75.

The ALJ modified the hypothetical individual to include an individual who could not engage in even sedentary work on a regular and consistent basis.  Tr. at 62.  The VE testified that such a person could not perform any past relevant work or any other jobs existing in significant numbers in the national economy.  *Id.*

## IV.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R.  404.1520(b) and 416.920(b) (1992));

2.     An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.     If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R.  404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R.  404.1520(d) and 416.920(d) (1992));

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).   The claimant has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show

that alternate jobs in the economy are available to the claimant, considering her age, education,

past work experience and RFC.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.**       **STANDARD OF REVIEW**

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social

Security Act, which states that the "findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this

Court is limited to determining whether substantial evidence supports the findings of the

Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v.*

*Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even

if substantial evidence exists in the record that would have supported an opposite conclusion, so

long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.*, 127

F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**VI.** **ANALYSIS**

    **A.** **STEP 3 AND LISTING 1.04A**

Plaintiff first asserts that the ALJ erred in at Step Three of his analysis because he did not fully evaluate whether her back conditions met or equaled any listed impairment and substantial evidence does not support his determination. ECF Dkt. #13 at 18-23. The undersigned recommends that the Court find that the ALJ's Step Three analysis is sufficient and substantial evidence supports the ALJ's determination that Plaintiff's back impairments did not meet Listing 1.04A.

The undersigned notes that the scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards and whether substantial evidence supports the findings of the Commissioner. *Abbott,* 905 F.2d at 922. Moreover, this Court cannot reverse the ALJ's decision if it is supported by substantial evidence, even if substantial evidence exists that would have supported an opposite conclusion. *Walters*, 127 F.3d at 528.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 416.920. In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order

to meet a listed impairment, the claimant must show that her impairments meet all of the requirements for a listed impairment.  *Hale v. Sec'y*, 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments."  *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam).  Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R.§  416.926(b).  In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sullivan*, 493 U.S. at 531.

Listing 1.04A provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Listing 1.04A.

The entirety of the ALJ's Step Three analysis is as follows:

> The undersigned has considered listings 1.00 for the claimant's degenerative joint disease and degenerative disc disease.  Though the claimant's attorney argued that the claimant met Listing 1.04, the undersigned finds the medical evidence,

-23-

particularly the objective and clinical findings, inconsistent with the requirements of the listing.  The claimant's attorney argued that the claimant had not been prescribed surgery due to insurance issues, but the evidence suggests the claimant was not approved for MRIs or surgery due to insufficient objective findings during examination to support further diagnostic testing.

The undersigned finds there is no evidence that the claimant meets any of the above listings.  Further, no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.  In reaching this conclusion, the undersigned has considered the opinions of the State agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process.

Tr. at 15.  The undersigned questions whether this analysis suffices to support a finding that Plaintiff's impairments did not meet or equal Listing 1.04A, especially considering the ALJ's speculation as to the reason why Plaintiff did not undergo a more recent MRI and the fact that she had not been prescribed surgery.

However, the undersigned reiterates that it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *Evans,* 820 F.2d at 164.  In addition, the Court may look to the rest of the ALJ's decision in addition to Step Three in order to determine whether substantial evidence supports the ALJ's Step Three determination.  *See Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999, at *8 (it was proper for the court to look at other steps of ALJ's decision to determine Step Three analysis), citing *Bledsoe v. Barnhart,* 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Snoke v. Astrue,* No. 2:10CV1178, 2012 WL 568986 (S.D. Ohio, Feb. 22, 2012), unpublished ("[r]ather, a court must read the ALJ's step-three analysis in the context of the entire administrative decision and may use other portions of a decision to justify the ALJ's step-three analysis.").  Moreover, the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.  *See Hufstetler v. Comm'r of*

-24-

*Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at \*10 (N.D.Ohio June 17, 2011). In *Hufstetler,*
the Court found that the ALJ's lack of sufficient analysis at Step Three was not harmless error
because the ALJ's Step Four findings provided sufficient information for the Court to determine
that no reasonable administrative fact finder would have resolved the matter differently. 2011 WL
2461339, at \*10.

Upon review of the entirety of the ALJ's decision in this case, the undersigned
recommends that the Court find that substantial evidence supports his determination that Plaintiff's
impairments did not meet Listing 1.04A.  In his Step Three analysis, the ALJ generically refers to
the objective and clinical findings as inconsistent with the requirements of Listing 1.04.  Tr. at 15.
The ALJ also speculates as to reasons why Plaintiff did not have a more recent MRI or why she
was not prescribed surgery.  *Id.*  These reasons are insufficient to meet the Step Three
requirements.

However, in reviewing the entirety of the ALJ's decision, he noted that Plaintiff's last
lumbar MRI was May 23, 2007 and showed mild right paramedian disc herniation at the L5-S1
level causing slight right-sided anterior thecal sac flattening.  Tr. at 16, 362.  This MRI well
preceded Plaintiff's amended onset disability date of September 20, 2012 and did not show
definitive nerve root compression as required by the first part of Listing 1.04A.  *Id.*  While
Plaintiff disputes the speculative reason given by the ALJ as to not having a more recent MRI, the
fact remains that the most recent MRI on file preceded the onset date by three years and did not
definitively show the required nerve root compression that Listing 1.04A requires.  In order to
meet a listed impairment, the claimant must show that her impairments meet all of the
requirements for a listed impairment.  *Hale,* 816 F.2d at 1083.  Plaintiff points to no more recent or
definitive evidence establishing the required nerve root compression and therefore has not met her
burden of establishing that she has met Listing 1.04A.  Further, with no more recent or definitive

evidence in the record as to nerve root compression, the ALJ's inadequate explanation at Step Three is harmless error because a review of the decision as a whole leads the undersigned to conclude that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.  Accordingly, the undersigned recommends that the Court find that Plaintiff's back impairment did not meet Listing 1.04A.

The issue of medical equivalence presents a more difficult issue.  The ALJ concludes in Step Three that no treating physician mentioned findings equivalent in severity to the criteria of any listed impairment.  Tr. at 15.  This is the extent of his medical equivalency analysis.  However, Dr. Namey noted on January 14, 2011 that Plaintiff had spasm and tenderness in her lumbar spine, positive straight leg raises, leg weakness and deep tendon reflexes of 0/4 bilaterally.  *Id*. at 356. He noted on February 7, 2011 that Plaintiff had positive straight leg raises and deep tendon reflexes of +1/4.  *Id*. at 355.  He found on March 22, 2011 that Plaintiff had joint tenderness, decreased range of motion and absent reflexes.  *Id*. at 354. All of these findings support the medial equivalent of Listing 1.04A.

Defendant asserts that while some of the evidence shows that Plaintiff had findings of loss of sensation and reflexes, positive straight leg raises and weakness, "Plaintiff did not demonstrate that such findings were consistently occurring together during the relevant period."  ECF Dkt. #15 at 14, citing Tr. at 289, 317, 330, 369, 451, 602.  However, the ALJ did not make such a finding in his decision or cite law supporting such a finding, rendering Defendant's conclusion a post-hoc rationalization that this Court cannot use to affirm the ALJ's decision.  *Simpson v. Comm'r of Soc. Sec*., 344 Fed. App'x 181, 192 (6th Cir. 2009).  Without proper explanation by the ALJ as to any alleged inconsistency of Dr. Namey's findings or further support for his conclusion on medical equivalence, the undersigned recommends that the Court remand the instant case for additional evaluation and analysis by the ALJ concerning whether Plaintiff's impairments medically equal

Listing 1.04A.

Defendant asserts harmless error by the ALJ as to his insufficient Step Three medical equivalence because the rest of his decision supports such a finding.  ECF Dkt. #15.  However, a review of the ALJ's entire decision, as detailed above, leads the undersigned to recommend that a reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner. *See Hufstetler*, 2011 WL 2461339, at *10.  The ALJ did state at Step Three that no treating physician had mentioned findings equivalent in severity to any of the listed impairments.  Tr. at 15.  However, as cited above, Dr. Namey's treatment notes, medical source statement and pain questionnaire present such evidence.

The undersigned notes that the ALJ discussed some of Dr. Namey's treatment notes and his opinions, and he attributed little weight to those opinions because the amount of hours that Dr. Namey opined that Plaintiff could sit, stand and walk and had to lie down did not add up correctly in an eight-hour day.  Tr. at 23.  He also attributed little weight to Dr. Namey's opinions because of "claimant's proven ability to engage in work activity, on a temporary basis in 2010, which required her to engage in lifting, standing, walking, and sitting at a higher functional ability than opined by Dr. Namey."  *Id*.  The undersigned finds that these reasons do not constitute substantial evidence for attributing little weight to Dr. Namey's findings.  First,  Dr. Namey cited to Plaintiff's decreased range of motion, joint warmth and weakness due to her DDD in his medical source statement and in his treatment notes.  *Id*. at 286, 336, 339, 355-360, 630-633.  Positive straight leg raises, motor loss and reflex abnormalities were also cited in Dr. Namey's treatment notes.  *Id*. at 289, 336, 339, 355-360.  In addition, Plaintiff indicated that she could not sustain the job referred to by the ALJ in his decision due to her back condition.  *Id.* at 64-66, 315, 325.

The undersigned acknowledges that the regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened

articulation standard at step three when the ALJ's findings are supported by substantial evidence. However, the ALJ's inadequate articulation of medical equivalence at Step Three and a lack of sufficient support for his findings in the rest of his decision lead the undersigned to recommend that the Court find that remand is necessary as to whether Plaintiff's impairments, individually or in combination, equal Listing 1.04 and to require the ALJ to provide sufficient articulation of such findings upon remand.

> **B**.     **RFC**

Plaintiff also challenges the ALJ's RFC finding, asserting that substantial evidence does not support the RFC because the ALJ failed to analyze some of the medical opinions that advanced greater limitations that those that he determined.  ECF Dkt. #13 at 23-25. As to her challenges to the ALJ's physical RFC, the undersigned recommends that the Court decline to address this assertion because the ALJ's Step Three analysis concerning her back impairment may impact the ALJ's findings on this issue in his subsequent steps in the analysis.  *See Reynolds*, 424 Fed. App'x at 417.

As to the mental RFC, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination.  It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite her restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*.  The Ruling defines a

"regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations. SSR 96-8p.  The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)."  *Id.*  The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a "logical explanation" of the effects of the symptoms on the claimant's ability to work.  *Id.*

In the instant case, the undersigned recommends that the Court find that substantial evidence supports the ALJ's analysis and treatment of the limitations provided by Dr. Halas.  The ALJ noted Dr. Halas' findings in his Step Two analysis. Tr. at 14.  Dr. Halas had diagnosed Plaintiff with recurrent major depression and generalized anxiety disorder with panic attacks.  *Id.* at 327.  He opined that Plaintiff had a marked impairment in relating to others, as well as a moderate impairment in withstanding the stresses and pressures of daily work, a mild impairment in maintaining attention and concentration for simple, repetitive tasks, and no impairment in remembering and executing simple instructions and directions.  *Id.* at 14.  The ALJ attributed only some weight to Dr. Halas' opinion, finding that his marked restriction was not consistent with Plaintiff's treatment history and Plaintiff's testimony that it was her physical and not mental impairments that prevented her from working.  *Id.*  The ALJ subsequently attributed little weight

to the other agency psychological consultants' assessments, explaining that he did so because those assessments were based heavily on Dr. Halas' report.  *Id*.

The undersigned recommends that the Court find that substantial evidence supports the ALJ's treatment of Dr. Halas' marked limitation for Plaintiff and his decision to not include any mental limitations in his RFC for Plaintiff.  The ALJ reviewed the scant mental health evidence in the file, including Dr. Halas' psychological evaluation and notes showing that Plaintiff received Cymbalta and at one time Trazadone from Dr. Namey for depression.  Tr. at 14-15.  The record shows that Plaintiff had no prior mental health treatment and she testified at the hearing that she had no such treatment.  *Id*. at 71.  The ALJ noted that Plaintiff was prescribed Trazadone on February 22, 2011 by Dr. Namey after she reported anxiety and stress over her father's health.  *Id*. at 18, citing Tr. at 355.  Plaintiff indicated at the hearing that she was taking Cymbalta as prescribed by her family doctor and that it sometimes helped.  *Id*.  She also indicated that her absences from work, when she did work, were primarily due to physical impairments.  *Id*.  Further, in Plaintiff's disability report, Plaintiff identified only DDD and arthritis as the conditions that limited her ability to work.  *Id.* at 227.  The undersigned recommends that the Court find that these reasons constitute substantial evidence to support the ALJ's determination that Plaintiff had no mental limitations on her ability to perform work-related functions.

**VII.**  **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for further factfinding, analysis, and articulation regarding whether Plaintiff's lumbar impairments medically equal Listing 1.04A and whether all of her impairments in combination medically equal that Listing.  The undersigned recommends that the Court decline to make a determination as to whether substantial evidence supports the ALJ's RFC as to physical limitations for Plaintiff as the Step Three remand may impact the ALJ's

Step Four RFC findings.  However, the undersigned recommends that the Court AFFIRM the

ALJ's finding that Plaintiff had no mental limitations in her ability to perform work-related

functions.


Dated: February 6, 2015                          */s/ George J. Limbert*
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE



        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to
file objections within the specified time WAIVES the right to appeal the Magistrate Judge's
recommendation. L.R. 72.3(b).